186

## Application of FLORIDA POWER CORPORATION.
### No. 8485-EU.
Florida Public Service Commission.
April 27, 1966.

Edgar H. Dunn and H. A. Evertz, III, both of St. Petersburg, for the applicant.

Howard Williams, Tallahassee, for Aaron Wigginton and George Russ, protestants.

B. Kenneth Gatlin, Assistant General Counsel, for the commission's staff and the public generally.

Chairman EDWIN L. MASON, Commissioners JERRY W. CARTER and WILLIAM T. MAYO participated in the disposition of this matter.

BY THE COMMISSION.

Pursuant to due notice the commission held a public hearing at the Wakulla County Court House in Crawfordville on April 14, 1966.

The entire record herein, including the exhibits and testimony adduced at the public hearing, have all been examined by the full commission. After due consideration, the commission now enters its order in this cause.

By application in this docket, Florida Power Corporation seeks approval of a territorial agreement between it and Talquin Electric Co-Operative, Inc., involving territory in Jefferson, Leon, and Wakulla counties. The applicant, with its principal offices in St. Petersburg, is an electric utility subject to the jurisdiction of this commission pursuant to chapter 366, Florida Statutes. It furnishes electricity and power to customers in more than 250 municipalities and in 32 counties in the state. Talquin Electric Co-Operative, Inc. is an electric membership co-operative incorporated pursuant to chapter 425 of the Florida Statutes. Talquin Electric, like all other electric co-operatives in the state, is exempted from regulation by section 366.11, Florida Statutes.

Involved in the application is a transfer of about 150 customers from Florida Power Corporation to Talquin Electric Co-Operative, Inc. and about 350 customers from Talquin Electric to Florida Power. The basis for this application, according to Florida Power, is that in recent years the rural areas of Wakulla, Jefferson and Leon counties have grown substantially in business and industrial activity and have increased in population. As a result, both the company and the co-operative have gone after the new customers, expanding their respective service areas, particularly in Wakulla County, to the point where the areas are now contiguous in many places. These service areas have come to coincide and overlap to such an extent that several duplicating service facilities now exist and there is every indication that such duplication will occur more frequently in the future unless separate service areas are agreed to by the two utility systems. The applicant alleges that this duplication leads to an attempted preemption of areas by the premature construction of more lines than are needed for immediate service, which means that neither utility gets a full return on its investment and in effect must be subsidized by other customers of each utility. It creates dangerous and hazardous situations which increase the possibility of, and therefore the liability for, accidental injuries and deaths and it adversely affects the efficiency and continuity of service through power failures and interruptions. It requires more employees to be constantly on the spot in the competitive areas and consumes more time and energy in efforts to outsell the competing utility. It makes for unsatisfactory customer relations in that the customer, being caught between competing utilities, is drawn involuntarily into the competitive squabbles and must suffer the resulting service inefficiencies. It prevents the full development

of customer potential in the competitive area since knowledge that a full return is unobtainable tends to divert the activities necessary for such development to more fertile fields, all to the detriment of the customer.

This commission has recognized the wisdom of territorial agreements between competing utilities on several occasions. On March 28, 1958, it issued its order no. 2595 in docket no. 5256-EU relating to a territorial agreement between the applicant in this docket and the Orlando Public Utilities Commission and said as follows —

"Competition between public utilities of the same kind in the same territory is universally considered as uneconomical and inimical to the public interest."

On July 5, 1960, we entered order no. 2948 in docket no. 6081-EU and said as follows —

"It is our opinion that territorial agreements which will minimize, and perhaps even eliminate, unnecessary and uneconomical duplication of plant and facilities which invariably accompany expansions into areas already served by a competing utility, are definitely in the public interest and should be encouraged and approved by an agency such as this, which is charged with the duty of regulating utilities in the public interest. Duplication of public utility facilities is an economic waste and results in higher rates which the public must pay for essential services. Reasonable and realistic regulation in such cases, is better than, and takes the place of competition. A public utility is entitled under the law to earn a reasonable return on its investment. If two similar utilities enter the same territory and compete for the limited business of the area, each will have fewer customers, but there will inevitably be excess facilities which must earn a reasonable return. The rates in such a situation will be higher than the service is worth, or customers in more remote areas will bear some of the unjustified expense necessary to support such economic waste. In the absence of a specific statute limiting the service areas of various public utilities, territorial agreements such as we are concerned with here, constitute no unreasonable restriction on the commission's powers, but actually assist the commission in the performance of its primary function of procuring for the public essential utility services at reasonable costs."

The commission by the entry of this order, does not recede in any way from the general principles announced in the above quoted orders. It is still of the opinion that territorial agreements, when

properly presented to the commission in the proper circumstances, are advisable and indeed in the public interest. However, the application in this docket comes before the commission in an unusual set of circumstances.

What is presented to the commission by this application is an agreement executed by the applicant but unexecuted by Talquin Electric Co-Operative. The applicant presents to the commission the fact that the facilities of the two utilities and 500 customers have already been transferred. The applicant seeks from the commission its stamp of approval on what is an accomplished fact. This was all done with neither the knowledge nor the approval of this commission or any other official body, and without the consent or even the attempted solicitation of the consent of the individual customers involved. The record discloses as a fact that Florida Power Corporation and Talquin Electric Co-Operative, without the prior approval of this commission and pursuant to the unexecuted agreement filed in this proceeding, entered the property of each of the customers and physically removed the meter of one utility and installed the electric meter of the other utility.

While the commission because of state law has no jurisdiction whatever over the actions of the Talquin Electric Co-Operative, we do have jurisdiction over the applicant, Florida Power Corporation, and will in no way condone such arbitrary and unapproved action by that utility. We do not in any way have any intention of becoming a party to such an undesirable proceeding.

The record indicates that on March 28, 1966, the first transfer of customers began. A representative of Talquin Electric and a representative of Florida Power each visited the customer to be transferred. The record shows that an explanation was attempted to each of the customers as to what was happening, but in effect the customer was being told that the transfer was taking place and his individual consent was not solicited in any way. The testimony shows that the transferred customers were told that there was nothing that they could do about it. Accompanying these representatives, or following closely behind, was a meter installer. In the case of the transfers from Talquin Electric to Florida Power Corporation, the meter of Talquin Electric was removed and that of Florida Power Corporation was installed. The reverse was true as to those customers transferred from Florida Power Corporation to Talquin Electric. Two witnesses testified that the first they knew of being transferred was when they heard noises outside their houses, went to investigate and found that employees of the two utilities were removing one of Talquin Electric's meters and installing that of Florida Power Corporation. If no one was home at a customer's

residence, the change was made anyway.

A letter dated April 4, 1966, was mailed to the customers explaining that the transfer was being made. However, no consent was solicited in this letter. The applicant had no idea how many people had been personally contacted when the meters were changed, but proceeded to make second and third rounds to contact everyone to explain the transfer, although still no attempt was made to secure the various customers' agreement to the transfer. A second letter of explanation was sent on April 11, 1966. Again, however, the record reflects that the applicant had no intention of, nor gave any consideration to, securing the consent or permission of the transferred customers.

Talquin Electric followed the same procedure as did the applicant. The testimony indicates that none of Talquin Electric's customers consented to its termination of service to them. Talquin Electric Co-Operative's former customers who testified stated that they were in fact members of Talquin Electric Co-Operative, Inc., and have substantial capital credits with the Co-Op which are apparently in the nature of profits of the Co-Op placed to the credit of individual members, to be refunded at some future date. None of these former Co-Op members consented to the surrender of these credits and in fact objected most strenuously. This forced surrender of credits was a part of their basis for objecting to being transferred to Florida Power Corporation. However, the commission has no jurisdiction over co-operatives and cannot decide this particular issue. It must be left to the members of the co-operative itself, or the proper court.

The applicant has on file with the commission the rules and regulations under which they offer electrical service to customers. These rules and regulations are included in their tariff approved by the commission and provide in great detail that the company render service upon appropriate application being made by a prospective customer. The tariff further provides that before rendering service, the company will require a cash deposit from the prospective customer. Also provided is that the duly authorized agents of the company will have access to the premises of the customer for the purpose of inspecting the meter and other equipment belonging to the utility that are placed on the customer's property. When making such visits to the customer's property, neither the company nor its authorized agents shall be liable for trespass. It is admitted in this proceeding that no applications were filed by the approximately 350 customers who were acquired by Florida Power Corporation, no deposits were furnished by the customers, and no express permission was given for the installation

of the meters of Florida Power Corporation on the premises of these customers. However, the commission does not undertake to determine in this proceeding exactly what legal relationship Florida Power has created with these 350 customers by acquiring them in contradiction to its own rules and regulations.

No explanation was attempted by representatives of Talquin Electric or Florida Power Corporation to the transferred customers of the difference in rates between the two utilities. Generally, however, the rates of Florida Power Corporation are higher than those of Talquin Electric Co-Operative. In those instances where a customer of Talquin Electric had an all-electric home and was transferred to Florida Power Corporation, the customer, according to testimony, could conceivably have an increase of $6 to $8 per month on his electric bill. Undoubtedly, this rate differential has something to do with the public opposition to the transfers, in addition to the questionable procedure used by the utilities.

At the hearing Florida Power Corporation moved that the hearing be postponed because of the shortness of notice. The application was filed on April 11; 1966; the hearing was held on April 14, 1966. It is interesting to note that the testimony of the applicant indicates that it has been attemping since 1959 to enter into some sort of territorial agreement with Talquin Electric. The application involves substantially the same issues which have been presented to the commission by the applicant on several other occasions and it was undoubtedly quite familiar with the issues it wanted to present in this proceeding. Also, as noted above, the applicant had already transferred the customers as early as March 28, so apparently it knew very well what was involved in the application. Since the transfers were without the agreement of the customers, nor were the customers given an opportunity to be heard, the applicant is in no position to object to a hearing at this time. The commission assumes that when the application was filed, the applicant was ready to go forward with its case.

So, in summary, the commission has before it a partially executed agreement between a regulated and an unregulated utility, an audacious transfer of some 500 customers, an unauthorized acquisition of about 350 customers by a regulated utility, an unauthorized relinquishment of service to 150 customers by a regulated utility, the transfer being without the expressed consent of the customers involved or approval of this commission, and a presentation of testimony and evidence that is most unconvincing as to the necessity of this particular application. The commission does not find

and cannot find that the grant of this application for approval of the territorial agreement would be in the public interest.

It is therefore ordered that the application of Florida Power Corporation for approval of a territorial agreement between that company and Talquin Electric Co-Operative, Inc., be and the same is hereby denied. It is further ordered that Florida Power Corporation restore electric service to the transferred customers as it existed prior to March 28, 1966, the date on which the first transfer of customers involved in this application was made.

Chairman MASON specially concurs in this order as follows —

I further concur in this decision in specially noting that the benefits of a desired result can be so totally offset and completely destroyed by the method used to accomplish that result, that the harm more than overcomes the good.

Here the method involved in transferring these customers from one company to the other grossly offends the sensitivities of man. It is impossible for me to view this petition and conclude in good conscience that its approval would be in the public interest. One can scarcely isolate public interest in the one instance when that same public interest is trespassed upon in such an inconsiderate and offensive manner as the testimony indicates was done here.

No public utility, whether publicly or privately owned, has, by virtue of its authority to serve the public nor by the necessity for its commodity or service, a right to exchange customers in such a manner and with such complete disregard for the customer as was done herein.

The principal philosophies of this commission as stated above in the main part of this decision are re-adopted by me and this decision should not be considered a departure therefrom.

Commissioner MAYO concurs in the result reached in this order as follows —

Consistent with my position in past proceedings of this nature, that is, when a regulated and an unregulated utility submit to the commission a territorial agreement, I would deny this application for the additional reason that there is no specific statutory authority for the commission to consider such an application.